**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STEPHANIE CROCKETT,

        *Plaintiff-Appellant,*

    v.

MISSION HOSPITAL, INC., a North
Carolina corporation, a/k/a
Mission Hospital,

        *Defendant-Appellee,*

    and

CATHIE ST. JOHN-RITZEN,
Administrator CTA of the Estate
of deceased Harry Kemp,

        *Defendant.*

No. 12-1910

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Martin K. Reidinger, District Judge.
(1:11-cv-00095-MR-DLH)

Argued: March 20, 2013

Decided: May 30, 2013

Before GREGORY and AGEE, Circuit Judges, and
David A. FABER, Senior United States District Judge for
the Southern District of West Virginia,
sitting by designation.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Gregory joined. Senior Judge Faber wrote a separate concurring opinion.

## COUNSEL

George W. Moore, Asheville, North Carolina, for Appellant. Jonathan Woodward Yarbrough, Asheville, North Carolina, for Appellee.

## OPINION

AGEE, Circuit Judge:

Stephanie Crockett ("Crockett") appeals the district court's grant of summary judgment to her former employer, Mission Hospital, Inc. ("Mission"), on her hostile work environment claim brought under Title VII of the Civil Rights Act of 1963, 42 U.S.C. § 2000e ("Title VII"). For the reasons that follow, we affirm the judgment of the district court.

### I.

### A.

Crockett began working in a full-time capacity at Mission in 2002 as a radiologic technologist on the second shift. In February 2008, Crockett was reassigned and Harry Kemp ("Kemp") became her supervisor. He remained Crockett's supervisor until his death in March 2010. Despite his title as a supervisor, Kemp did not have the authority to hire or fire any employee, including Crockett.[1]

---

[1] When reviewing the district court's grant of summary judgment, we construe the facts in the light most favorable to Crockett, the nonmoving party. *Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006) (en banc).

In December 2009, Crockett was counseled concerning a lack of initiative based on her documented work history and the concerns of co-workers. In January 2010, she was cited for a violation of the administrative policy against the use of cellular telephones and the misrepresentation of facts to Mission representatives. On February 16, 2010, she was issued a final warning, which required an "immediate change in behavior and any non merit behavior or misrepresentation of fact. Use of cellular device[s] while working and not on break is not acceptable." (J.A. 304.) Crockett signed the final warning, which included the consequence that any further misconduct would result in the termination of her employment. Kemp was not involved in the decision to issue a final warning.

On February 18, 2010, Crockett saw Kemp in the break room when she first clocked in to work. When Kemp took out a copy of the final warning which had been issued to Crockett, she asked if she could speak with him about the situation. He agreed to do so but she asked if they might speak later in a non-public area of the hospital.

Around 8:30 p.m. that evening, Kemp came to get Crockett from the diagnostic area of the radiology department so that they could speak. Kemp led Crockett to an office which was no longer occupied. When Crockett asked why they were going to that office, Kemp replied that he thought his office had been bugged. When they entered the office, Kemp closed and locked the door. Kemp told Crockett that she had almost gotten him into a lot of trouble because she had complained that her performance evaluation scores had been changed by a supervisor in a position superior to Kemp. Further, Kemp told Crockett that since he could no longer trust her, she needed to prove to him that she was not wearing a wire device and recording the conversation. Kemp said that he had some information for Crockett regarding her job, but would not repeat it unless she proved that she was not wearing a wire. After about twenty minutes of discussion on the issue of

whether she was wearing a wire, Kemp told Crockett that he had been given her termination papers. Crockett felt that if she did not prove that she was not wearing a wire, Kemp would fire her on the spot.

Finally, Kemp lifted his shirt to show that he was not wearing a wire and offered to remove his trousers down to his shorts, an offer Crockett refused. Crockett then asked why she could not lift her shirt in front of a female technician, rather than Kemp, but he stated he did not want to get anyone else involved. Although Crockett did not know if Kemp had the authority to actually fire her, she felt that he could write her up for another corrective action which would result in her termination. Kemp told her that he was a happily married man and they just needed to get the wire issue resolved. Crockett began crying but finally lifted her shirt as fast as she possibly could to expose her bra. Kemp was still not satisfied, so Crockett finally lifted her bra to expose the underside of her breasts. She was unsure if her nipples had been exposed. Kemp did not make any sexual overtures to her and did not make any comment about her breasts. He calmly stated that they were now able to speak.

Crockett had continued to cry throughout this time. Kemp pulled his chair in front of the chair that Crockett was sitting in and placed his legs on the outside of her legs. Kemp reiterated that Crockett was in a lot of trouble and should not have complained to Mission's Human Resources department ("HR") that Chris Chandler ("Chandler"), who was in a supervisory position above Kemp, had changed the scores on her performance evaluation. Kemp told Crockett that he was the only person she could trust.

At the end of an approximately thirty-minute conversation, Crockett asked what else he wanted to tell her and Kemp replied that she should only trust him. Kemp then stated that they should "seal it with a kiss." (J.A. 75.) Crockett refused to kiss him, but replied, "[h]ow about a hug," while she leaned

forward to pat him on the back. (J.A. 76.) As Crockett turned away, Kemp kissed her right cheek and said, "I've always wanted just one kiss." (J.A. 76.) Crockett again refused. As she turned her head, Kemp kissed her cheek again. Kemp then said, "You're not going to tell anybody, are you?" to which Crockett replied that she would not. (J.A. 76.) Later that night, Kemp again sought reassurance that Crockett would not report the incident and on two more occasions asked for a kiss.

Prior to the incident on February 18, 2010, Kemp had never made any overtures of any kind toward Crockett. Nor did Kemp make any overtures of any kind toward Crockett after February 18, 2010.

Upset over the incident, Crockett asked Kemp if she could leave work one hour early. Her request was granted, but she did not contact anyone in HR or management at Mission about the incident. Crockett then took leave pursuant to the Family Medical Leave Act from February 19–24, 2010. On February 19, 2010, she retained an attorney.

## B.

When Crockett returned to work on February 25, 2010, she was summoned to a meeting with Teresa McCarthy ("McCarthy") of HR and Kathy Jones ("Jones"), the director of her department. Crockett was told that Kemp had reported continued misuse by Crockett of her cell phone and accused her of "flashing" him with her shirt in order to persuade him not to report the misuse. In response to these accusations, Crockett told them that Kemp had done something "horrific" to her and was trying to cover it up. (J.A. 101.) Crockett, however, refused to elaborate, stating that her attorney had advised her not to do so. Crockett also did not tell anyone in management at Mission about the incident. At the conclusion of the meeting, Crockett took Jones to her locker in order to prove that her cell phone was in the locker and had not been

used. Jones told Crockett that she would "get to the bottom of this," but placed Crockett on suspension pending the conclusion of the investigation. (J.A. 106.) Crockett remained on suspension until March 8, 2010.

On February 26, 2010, McCarthy and Karen Ensley ("Ensley"), another HR representative, met with Kemp about Crockett's allegation that he had done something "horrific" to her. Kemp denied that anything unusual had occurred between them.

On March 1, 2010, McCarthy and Ensley met with Crockett. Ensley asked if the incident of February 18, 2010, had involved Kemp making sexual advances toward Crockett. Crockett nodded yes. She refused, however, to provide any additional details. During that meeting, Crockett was provided with a copy of Mission's sexual harassment policy and advised of the process used to report a claim of harassment or discrimination. Crockett again refused to prove any details or to file a formal complaint.

McCarthy and Ensley also met with Chandler on March 1, 2010 to ascertain what, if any, information he had about the February 18 and February 25, 2010 incidents. Chandler stated that he had seen both Crockett and Kemp on February 18, 2010, but that nothing seemed to be out of the ordinary. He also stated that Crockett had not reported any such incident to him.

Over the next couple of days, McCarthy interviewed at least five of Crockett's co-workers to see if anyone had witnessed or knew about the February 18, 2010 incident. None of the co-workers had seen or heard anything unusual.

McCarthy and Ensley had another meeting with Crockett on March 5, 2010, during which they told her that she could return to work on March 8, 2010. Crockett was told that their investigation had failed to substantiate Kemp's claims of her

misconduct and, therefore, she was allowed to return to work. Although Crockett thought they were going to transfer her so that Kemp would no longer be her supervisor, she was told that Kemp would remain her superior. When Crockett pleaded with them not to make her work under Kemp, she was told that if she did not report to work on March 8, 2010, she would be terminated. Crockett acknowledged that an employee who was in corrective action, such as she, was not eligible for a transfer.[2]

On March 6, 2010, McCarthy, Jones, and Chandler met with Kemp to review the allegations contained in Crockett's Equal Employment Opportunity Commission ("EEOC") Charge, which had been received by that time at Mission. Kemp continued to deny that anything unusual or inappropriate had occurred between he and Crockett.

When Crockett returned to work on March 8, 2010, she was told that both she and Kemp were instructed to conduct themselves as "business as usual." (J.A. 124.) Crockett asked whether Mission had received her EEOC Charge and was told that the complaint had been received.

On March 9, 2010, Crockett finally completed Mission's form complaint to report the incident with Kemp. In that form, however, Crockett merely wrote that reference should be made to her EEOC Charge and gave no additional information.

After Crockett returned to work on March 8, 2010, she did not experience any further harassing treatment from Kemp.

---

[2]Crockett later acknowledged that the HR representatives investigated the February 18, 2010 incident while she was under suspension and also admitted that she refused to tell them any further details about what had occurred. (J.A. 101–04, 106–08.) Crockett nonetheless felt that Mission had not adequately responded to the situation because Kemp continued to be her supervisor.

On March 17, 2010, Crockett had a meeting with McCarthy during which Crockett disclosed that she had surreptitiously tape recorded a conversation with Kemp on February 25, 2010. During that meeting, Crockett—for the first time—told HR the complete details of the February 18, 2010 incident.

McCarthy met with Kemp a third time on March 18, 2010, and he once again denied the allegations. After that meeting, Kemp left work and committed suicide.

McCarthy also met with Crockett on March 18, 2010, at which time Crockett played the tape recording she had made on February 25, 2010. Crockett had left the recorder functioning while she was treating and working with patients on that day, thereby surreptitiously recording conversations with and statements made by her patients. Crockett had also tape recorded, without McCarthy's knowledge, the meeting she had with McCarthy on March 17, 2010. At one point towards the end of the March 18, 2010 meeting, McCarthy asked if Crockett was recording the meeting. Crockett admitted that she was doing so.

On March 24, 2010, Crockett's employment was terminated for tape recording her interactions with and treatment of patients in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), and for secretly tape recording her co-workers and her meeting with McCarthy. Crockett acknowledged that Mission had a policy against such disclosures which was clearly stated in Mission's employee handbooks. Additionally, Crockett admitted that she knew violations of that policy could result in termination of employment, as well as civil and criminal penalties. Crockett also acknowledged that Mission's harassment and discrimination policy contained a prohibition against tape recording investigatory interviews conducted by HR and/or management after a complaint of harassment or discrimination.

C.

Crockett first filed an action against Mission in North Carolina state court, alleging claims for employment discrimination in the form of a hostile work environment and retaliatory discharge in violation of Title VII, as well as a state law claim for intentional infliction of emotional distress. Mission removed the action to the United States District Court for the Western District of North Carolina, where Crockett agreed to the dismissal of her retaliatory discharge and intentional infliction of emotional distress claims.

Mission moved for summary judgment on Crockett's remaining hostile work environment claim, which the district court granted. The district court found that Crockett could not establish that she had suffered a tangible employment action. The district court further found that Mission was entitled to an affirmative defense to defeat liability because it had exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and Crockett had unreasonably failed to take advantage of any preventive or corrective opportunities provided by Mission.

Crockett timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

A.

We review the district court's grant of summary judgment *de novo*, applying the same standard as the district court. *Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

B.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Because "an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R&R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).

To establish a hostile work environment based on sexual harassment under this provision, a plaintiff-employee must prove that (1) the conduct was unwelcome; (2) it was based on the plaintiff's sex; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer. *Spicer v. Commonwealth of Va., Dep't of Corr.*, 66 F.3d 705, 709–10 (4th Cir. 1995) (en banc) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)). "If the plaintiff's claim is based on the actions of her supervisor, the employer is subject to vicarious liability [where the harassment culminated in a tangible employment action]. If the plaintiff did not suffer a tangible employment action, the employer has available to it an affirmative defense that may protect it from liability or damages." *Whitten v. Fred's, Inc.*, 601 F.3d 231, 243 (4th Cir. 2010) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

In analyzing Mission's motion for summary judgment, the district court began by acknowledging the parties had agreed that Crockett's forecast of evidence regarding Kemp's conduct met the first and second elements of her claim by establishing that the conduct was unwelcome and based on Crockett's sex. As to the third element, the court found that Crockett had presented sufficient evidence to show a material

question of fact as to whether Kemp's conduct was sufficiently severe to create a hostile work environment. With respect to the fourth element, however, the court found that Crockett had not suffered a tangible employment action and, as such, Mission was entitled to present evidence of an affirmative defense. The district court then concluded that Mission had exercised reasonable care to prevent and correct any sexually harassing behavior, and that Crockett had unreasonably failed to take advantage of those measures. For these reasons, the district court granted summary judgment to Mission.

On appeal, Crockett contends that the district court erred in concluding that she failed to establish that she had suffered a tangible employment action. Crockett also contends that the district court erred in finding that Mission was entitled to raise an affirmative defense. As explained below, none of these contentions have merit.

1.

We first address Crockett's contention that the district court erred in concluding that she failed to establish that she had suffered a tangible employment action.[3] "A tangible employ-

---

[3]Mission argues the district court erred in finding that a material issue of fact existed as to the third element of Crockett's claim, a severe or pervasive hostile work environment. Crockett responds that Mission failed to file a cross-appeal and we cannot therefore consider that argument, while Mission rejoins that we can affirm the lower court's judgment on any basis apparent in the record. *See Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("[W]e may affirm a judgment for any reason appearing on the record."). Viewing the evidence in the light most favorable to Crockett, whether the harassment complained of here was severe enough to create a hostile work environment is a close question. *See, e.g.*, *Whitten v. Fred's, Inc.*, 601 F.3d 231, 243 (4th Cir. 2010) (finding two-day period consisting of verbal abuse and two incidents of supervisor pressing his genitals against plaintiff's body to be sufficiently severe); *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 336 (4th Cir. 2010) (finding gender-based language, songs, and comments to be sufficiently severe). As it is unnecessary to decide the foregoing issue because of the ultimate disposition of this case on other grounds, however, we will assume, without deciding, that Kemp's conduct was sufficiently "severe" to create a hostile work environment.

ment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

Crockett, with good reason, does not argue that her termination constituted a tangible employment action. The record is undisputed that she was terminated for surreptitiously recording patients and McCarthy in violation of the clear prohibition in the employee handbooks, but more seriously, violating HIPAA. Crockett instead argues only that her seven-day suspension beginning on February 25, 2010, constituted a tangible employment action. Specifically, Crockett contends that Kemp's harassing conduct was not limited to the February 18, 2010 incident. She alleges that Kemp falsely accused her of using her cell phone on February 25, 2010, and then flashing him in an attempt to persuade him not to report that usage. Crockett argues that this behavior led to her suspension, which altered the conditions of her employment.

In considering Crockett's claim based on her seven-day suspension, the district court noted the general rule in a Title VII case "that the factual allegations in formal litigation must correspond to those set forth in the administrative charge." (J.A. 364 (citing *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005)); *see also Balas v. Huntington Ingalls Indus., Inc.*, No. 12-1201, ___ F.3d ___, 2013 WL 1019625, at *4 (4th Cir. Mar. 15, 2013). The district court then observed that although the suspension and the alleged events of February 25th were "not contained within the EEOC charge. It is nonetheless considered in the interest of finality." (J.A. 367 n.9.) Thus, the district court specifically considered all of Crockett's allegations, including those about the February 18th and 25th incidents, in arriving at its decision.

With all of Crockett's allegations before it, the district court articulated three distinct and independent reasons in finding that Crockett was unable to establish that her suspension was

caused by Kemp's alleged sexual harassment. While each of these reasons would separately support the finding of the district court, they are fully conclusive when considered in tandem.

First, at the time of her suspension, Crockett had not told anyone at Mission that Kemp had engaged in sexually harassing conduct. During the February 25, 2010 meeting, Crockett stated that Kemp had done something "horrific," but refused to disclose what he had done. McCarthy and Jones were thus ignorant of Crockett's later claim of sexual harassment.

Second, at the time of her suspension, Crockett had been given a final warning regarding her unauthorized and improper use of cell phones. The decision to suspend her when another allegation of unauthorized phone usage was received was not made by Kemp, but by McCarthy and Jones. Kemp, therefore, had no role in the decision to suspend Crockett. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) (en banc) (to survive summary judgment plaintiff "must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer"). Crockett's mere speculation that Kemp did so is insufficient to withstand summary judgment. *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) ("[m]ere speculation or the building of one inference upon another" will not resist summary judgment).

Finally, although Crockett contends that she suffered a tangible employment action because she was suspended without pay, she presented no forecast of evidence to suggest that she suffered any pecuniary loss. Crockett merely cites to a statement from McCarthy that the suspension would be unpaid *if* she did not have paid time off ("PTO") available to cover it. There is no evidence in the record that Crockett did or did not have PTO available, or that Crockett was forced to use any

PTO during her suspension. Crockett simply failed to carry her burden of producing any evidence on this point.

Accordingly, we conclude that the district court did not err in finding that Crockett failed to establish that she had suffered a tangible employment action.

2.

We next consider Crockett's contention that the district court erred in finding that Mission was entitled to raise an affirmative defense. "When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Faragher*, 524 U.S. at 807. The defendant-employer must prove (1) that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) the plaintiff-employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* As explained above, we agree with the district court's conclusion that Crockett failed to establish that she suffered a tangible employment action. The district court thus did not err in finding that Mission was entitled to raise an affirmative defense. We further conclude that Mission amply satisfied its burden in proving both elements of its affirmative defense. Accordingly, we affirm.

As to the first element of the affirmative defense, Crockett has conceded that Mission established, disseminated, and enforced an anti-harassment policy and complaint procedure and took reasonable steps to prevent harassment.[4] (J.A. 140–49); *see also Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999) ("[W]here, as here, there is no evidence that an employer adopted or administered an anti-harassment policy

---

[4]It is undisputed that Crockett received training each year in the procedure for reporting sexual harassment.

in bad faith or that the policy was otherwise defective or dysfunctional, the existence of such a policy militates strongly in favor of a conclusion that the employer exercised reasonable care to prevent and promptly correct sexual harassment.") (quotation marks omitted). Crockett, however, argues that Mission failed to correct Kemp's harassment promptly because on February 25, 2010, Mission suspended Crockett rather than investigate her vague allegation that Kemp had done something "horrific" to her. Crockett further argues that Mission's failure was exacerbated when McCarthy refused to transfer her so that Kemp would no longer be her supervisor.

We disagree. The existence of a viable anti-harassment policy is accompanied by other undisputed evidence of Mission's prompt and reasonable care. McCarthy, Jones, and Ensley immediately began an intensive investigation on February 25, 2010, after Crockett accused Kemp of "horrific" behavior toward her, despite the fact that she refused to provide any further details or information. They interviewed numerous employees and supervisors in Crockett's department, but were handicapped by Crockett's refusal to cooperate and give Mission some clue as to her complaint. Since Crockett had refused to provide any information, their attempts to investigate her claim were unsuccessful.

Mission's human resources and management officials continued to investigate, despite Crockett's refusal to provide any information. On March 1, 2010, they met with Crockett again and attempted to elicit whether Kemp's conduct had involved sexual advances. Crockett nodded yes, but did not provide any details. At that time, she was counseled in the procedure for filing a formal complaint and provided a copy of the sexual harassment policy. *See Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir. 2001) ("Distribution of an anti-harassment policy provides compelling proof that the company exercised reasonable care in . . . promptly correcting sexual harassment.") (quotation marks omitted).

McCarthy and other Mission representatives met with Crockett again on March 5 and 8, 2010, but she still refused to disclose any details of the alleged February 18, 2010 incident. Crockett finally signed a Mission harassment complaint on March 9, 2010, but merely referenced her EEOC Charge. It was not until March 17, 2010, that Crockett finally discussed the details of the February 18, 2010 incident with McCarthy and Jones.

In the meantime, McCarthy and Jones had interviewed Crockett's co-workers in an attempt to learn if anyone had witnessed the events of February 18, 2010, heard anything, or suspected anything based on the conduct of Kemp and Crockett. McCarthy and other representatives again met with Kemp on March 8, 2010, to review the allegations of Crockett's EEOC Charge. Kemp was interviewed a third time on March 18, 2010, and continued to deny Crockett's allegations.

Throughout all of this, Crockett maintains that Mission should have transferred her to another shift so that she would not have any contact with Kemp. At that time, however, Crockett had provided no facts which would have supported her transfer.[5] Moreover, Crockett was ineligible for transfer because she was in final warning status, which she knew. Crockett basically argues that Mission should have modified its transfer policies at her behest based on an allegation that she herself was unwilling to substantiate. *See Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 269 (4th Cir. 2001) ("If Title VII's prohibitions against sexual harassment are to be effective, employees must report improper behavior to company officials."). In light of a fully-functioning anti-harassment policy and its undertaking of a prompt and thorough investigation, we conclude that Mission has met its burden on the first element of its affirmative defense.

---

[5]By the time Crockett finally disclosed some facts supporting her accusations on March 17, 2010, Kemp's suicide the following day rendered it impossible for Mission to take any further action against him.

As to the second element, the evidence that Mission has met its burden is just as clear. "[P]roof that a plaintiff employee failed to follow a complaint procedure will normally suffice to satisfy the employer's burden under the second element of the defense." *Brown*, 184 F.3d at 395 (quotation marks omitted). The uncontradicted evidence establishes that Mission met with Crockett on numerous occasions in an effort to promptly correct the situation, counseled her in the procedure for filing a formal complaint, and provided her with a copy of the sexual harassment policy, despite Crockett's unwillingness to cooperate with the investigation. Even viewing this evidence in the light most favorable to Crockett, we conclude that no reasonable factfinder could reach any conclusion other than that Crockett "unreasonably failed to take advantage of any preventive or corrective opportunities." *Faragher*, 524 U.S. at 807. As a result, it is unnecessary to reach the issue of whether Crockett also "unreasonably failed . . . to avoid harm." *Id.*

The undisputed facts demonstrate that Mission has satisfied both elements of its affirmative defense. Mission thus cannot be held vicariously liable for Kemp's alleged harassment of Crockett. Accordingly, we conclude that the district court did not err in granting summary judgment to Mission.

## III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

FABER, Senior District Judge, concurring:

I concur with the decision of the majority, but I would decide the case on a different ground. I believe the evidence of harassment viewed in the light most favorable to the plain-

tiff was insufficiently severe to create an objectively hostile work environment.

A hostile work environment is actionable under Title VII only when the workplace "is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). The "severe or pervasive" requirement has both subjective and objective components. *See id.* at 21-22. Motions for summary judgment are an appropriate vehicle for courts to "police the baseline for hostile environment claims" *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 n. 8 (5th Cir. 1999).

The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment. . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Furthermore, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.*

Crockett worked for Mission for over seven years without incident. The alleged harassment took place over the course of a single evening within that approximately seven-year period. While even a single incident can be sufficiently severe to create a hostile work environment, *see Okoli v. City of Baltimore*, 648 F.3d 216, 220 n. 5 (4th Cir. 2011), the conduct complained of herein does not rise, in my view, to the requisite level of severity.

In all other respects I am in agreement with the majority opinion.