**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-1170**

_____

NARENDRA MAVILLA; PADMAVATHI MAVILLA,

     Plaintiffs - Appellants,

   v.

ABSOLUTE COLLECTION SERVICE, INC.,

     Defendant – Appellee,

   and

WAKEMED FACULTY PHYSICIANS,

     Defendant.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Fox, Senior District Judge.  (5:10-cv-00412-F)

_____

Submitted:  August 30, 2013    Decided:  September 10, 2013

_____

Before GREGORY, DAVIS, and WYNN, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

Christopher W. Livingston, White Oak, North Carolina, for Appellants.  Sean T. Partrick, Jennifer D. Maldonado, Allison J. Becker, YATES, MCLAMB & WEYHER, LLP, Raleigh, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellants Narendra Mavilla and Padmavathi Mavilla ("Appellants" or "the Mavillas") appeal the district court's orders setting aside entry of default against Appellee Absolute Collection Service, Inc. ("ACS" or "Appellee"), and granting summary judgment in favor of ACS on all claims. The district court found good cause to set aside entry of default, and that Appellants failed to present any evidence of actionable conduct by ACS under either the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*, or the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.* We affirm.

I.

Appellants commenced this action against ACS, a consumer debt collection agency, on October 4, 2010 in the District Court for the Eastern District of North Carolina. Appellants claimed ACS violated the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*, the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.*, and sections of the North Carolina Debt Collection Act, N.C. GEN. STAT. § 75-54 and the North Carolina Collection Agency Act, N.C. GEN. STAT. § 58-70-95(3),- 110(4), and -115(1). The complaint alleged that ACS violated these laws when it mailed written letters and placed phone calls to the Mavilla residence attempting to collect debts for prenatal and obstetric care services purportedly received by Mrs. Mavilla.

3

ACS mailed three letters to Mrs. Mavilla on April 14, 2009, demanding payment of $126 for services rendered on June 13, 2005, $54 for services rendered on June 30, 2005, and $312 for services rendered on July 26, 2006. On April 16, 2009, ACS mailed Mrs. Mavilla a copy of the itemized medical bills from WakeMed Faculty Practice Plan ("WakeMed"), the medical service providers, as proof of the debts. On June 3, 2009, ACS mailed three more letters to Mrs. Mavilla, one for each debt, which warned her that "since [she] did not respond to [ACS's] initial request[s] for payment, [ACS] ha[s] initiated further, more serious collection activity." J.A. 34-36. The letters advised Mrs. Mavilla to contact ACS's office immediately to either pay the debts in full or arrange a payment plan in order to "prevent this from appearing on [her] credit report." Id.

In addition to the letters, ACS placed at least 21 phone calls to the Mavilla residence between April 15, 2009 and December 9, 2009, in efforts to collect the WakeMed debts. In several of these calls, Mrs. Mavilla informed ACS representatives that she had not incurred the debts and that, indeed, it was impossible that she received the alleged services because she had been incapable of bearing children since 2001.

On July 21, 2009, the Mavillas mailed a dispute letter to WakeMed denying that Mrs. Mavilla received any services from WakeMed. ACS continued to call the Mavilla residence, and on

4

August 24, 2009, Mrs. Mavilla mailed a letter to ACS demanding that "all types of communications" cease immediately "until the dispute has been resolved with Wakemed." J.A. 39. Mrs. Mavilla mailed an additional dispute letter to WakeMed on August 24, 2009, as well. Although ACS made several attempts to collect the debt from the Mavillas, Mrs. Mavilla testified that ACS never threatened to file a lawsuit to collect the debts.

ACS reported a total of $492 of unpaid medical debt to credit reporting bureaus to be placed on Mrs. Mavilla's credit reports. On December 28, 2009, the Mavillas paid $180 to ACS to satisfy part of the WakeMed debt.

In September 2010, the Mavillas were twice negatively affected by ACS's reporting the unpaid WakeMed debts to consumer credit reporting bureaus. First, Mrs. Mavilla applied for a Kohl's retail store credit card and was denied based on the negative report submitted by ACS. Then, the Mavillas were denied refinancing on their home mortgage because of the ACS report on Mrs. Mavilla's credit. According to the Mavillas, had their refinancing application been approved, they would have saved $268.03 per month, and a total of $80,409.00 over the course of their 300-month mortgage.

On September 26, 2010, the Mavillas disputed the debts through the credit bureaus, which then communicated the dispute to ACS on September 27, 2010. The Mavillas contend that ACS

5

should have further investigated the debt even though WakeMed continued to affirm the validity of the debts in the face of Mrs. Mavilla's dispute. However, Mrs. Mavilla conceded that if ACS had further investigated the debts, it is likely that "WakeMed would have also told ACS that they believed that the[] charges belonged to [Mrs. Mavilla]." J.A. 458. She also testified that she knew of no information that would suggest that ACS knew that the debts were not her obligations.

On October 4, 2010, the Mavillas initiated this lawsuit for violations of various federal and state debt collection laws. Sometime after the suit was filed, ACS was notified by WakeMed that the debt in fact did not belong to Mrs. Mavilla, and in response, ACS "close[d] the [Mavilla] account at the credit bureaus and remove[d] the information from [its] system." J.A. 212. It is unclear from the record what new evidence WakeMed relied on to change its position on Mrs. Mavilla's responsibility for the debt.

On October 12, 2010, ACS's general counsel, Ken Perkins ("Perkins") learned of the Mavillas's suit against ACS. According to an affidavit submitted by Perkins, he spoke with Appellants' counsel by phone at the end of October 2010 and requested an unlimited extension of time to respond to the Summons and Complaint. Perkins contends that Appellants' counsel

agreed to the requested extension and did not condition the agreement on the parties engaging in settlement discussions.

On December 21, 2010, Appellants moved for an Entry of Default against ACS; the Clerk of the Court entered the default. Appellants then moved for Default Judgment, and the district court directed Appellants' counsel to file documents in support of the default judgment motion. While the district court was considering the motion, ACS filed a Notice of Appearance of Counsel and Motion to Set Aside Entry of Default.

In support of its motion, ACS submitted Perkins's affidavit, in which he explained that he had not filed a notice of appearance nor a response to the complaint in reliance on the parties' agreement to an unlimited extension of time to respond. He averred that ACS's "failure to file an Answer was a mistake" of counsel that was not the fault of ACS and was thus "not fairly imputable to ACS having been occasioned solely by the neglect of counsel." J.A. 98. Perkins also stated that he only learned that Appellants had received an Entry of Default against ACS because he happened to have reviewed computerized case filings on April 20, 2011. ACS filed its Notice of Appearance of Counsel on the same day that the Entry of Default was discovered. In response to ACS's Motion to Set Aside Entry of Default, Appellants' counsel submitted an affidavit declaring

7

that he had agreed to an extension of 30 days, not an unlimited extension.

On July 25, 2011, the district court granted ACS's Motion to Set Aside Entry of Default. The parties engaged in discovery and both sides moved for summary judgment. The district court granted summary judgment for ACS on all federal claims and declined to exercise supplemental jurisdiction over the state law claims. Appellants filed a timely notice of appeal.

II.

The Mavillas argue that the district court erred in setting aside the entry of default they had obtained against ACS. They maintain that ACS showed no good cause supporting such a decision.

This Court reviews a district court's decision to set aside an entry of default for abuse of discretion. Colleton Prep. Acad., Inc. v. Hoover Universal, 616 F.3d 413, 417 (4th Cir. 2010). A district court has abused its discretion when it "acts in an arbitrary manner or relies on an erroneous principle of law." Ga. Pac. Consumer Prods., L.P. v. Von Drehle Corp., 710 F.3d 527, 533 (4th Cir. 2013) (internal quotation omitted).

Under Federal Rule of Civil Procedure 55(c), a district court can set aside an entry of default "[f]or good cause shown." Fed. R. Civ. P. 55(c). In deciding whether to set aside an entry of default, a district court should consider

whether the moving party has a meritorious defense, whether it acts with reasonable promptness, the personal responsibility of the defaulting party, the prejudice to the party, whether there is a history of dilatory action, and the availability of sanctions less drastic.

Id. quoting Payne ex rel. Estate of Calzada v. Brake, 439 F.3d 198, 204-05 (4th Cir. 2006). This Court has "repeatedly expressed a strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits." Colleton, 616 F.3d at 417.

The district court conducted the applicable "good cause" analysis. It concluded that ACS adequately demonstrated a meritorious defense: that it relied on information its client, WakeMed, provided as the basis for attempting to collect the debts from Mrs. Mavilla, and that it had no knowledge of the fact that WakeMed had made an error in attributing the debt to her. With regards to the promptness of ACS's actions after learning of the default, the district court noted that ACS filed a Notice of Appearance the very same day its counsel learned of the Entry of Default on the docket. The court found that ACS's counsel misunderstood the length of the extension of time agreed to by Appellants' counsel and that that misunderstanding was not attributable to his client. Appellants' counsel himself admitted that the Mavillas would "suffer no prejudice from having to prove their case," which the district court took as another

factor weighing in favor of setting aside the default. J.A. 128. Lastly, the district court found that ACS has been a party to other actions in that court, but none had been defaulted. The court concluded that, even if no lesser sanction was available, all other relevant factors demonstrated good cause to set aside the entry of default.

The district court's decision was not arbitrary, and Appellants provide no basis on which to conclude the court relied on erroneous principles of law. All factors considered, ACS demonstrated good cause to set aside the entry of default, an outcome consistent with this Court's strong preference against disposing of cases in that manner.

III.

Appellants next argue that the district court erred in granting summary judgment to ACS on all claims under the FDCPA. We review a grant of summary judgment de novo, and apply the same standard as the district court. Crockett v. Mission Hosp., Inc. 717 F.3d 348, 354 (4th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Count IV alleged violations of the FDCPA arising from ACS's attempt to collect on the WakeMed debts. Specifically, Appellants maintain that ACS violated 15 U.S.C. § 1692e(2)(A),

10

(5), and (10), and § 1692f of the FDCPA by attempting to collect debts that the Mavillas did not owe by "misrepresenting to them that they owed these debts and then misrepresenting to the credit bureaus that they owed these debts." Appellant's Br. 33. Appellants devote a large portion of their argument on this issue to asserting that ACS has failed to establish its defense of bona fide error. We find, however, that the undisputed facts demonstrate that Appellants failed to make a prima facie case under the FDCPA.

Section 1692e(2)(A) prohibits a debt collector from making a false representation of "the character, amount, or legal status of any debt" in connection with the collection of a debt. 15 U.S.C. § 1692e(2)(A). Under Section 1692e(10), it is unlawful for a debt collector to use any "false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(10). It is unclear how Appellants contend ACS falsely represented the character, amount, or legal status of the WakeMed debt, or how ACS used false representations or deceptive means to attempt to collect the debt. Appellants have failed to identify the exact conduct that violated these provisions of the FDCPA, and similarly have failed to present any evidence in support of the claims. The district court correctly granted summary judgment for ACS on these allegations.

11

Section 1692e(5) prohibits a debt collector from threatening to "take any action that cannot legally be taken or that is not intended to be taken." 15 U.S.C. § 1692e(5). The Complaint seems to allege that although these debts were beyond the statute of limitations, ACS was threatening the Mavillas with a lawsuit if they failed to pay the debt. J.A. 15-16. However, in her deposition testimony, Mrs. Mavilla admitted that ACS never threatened to file a lawsuit to collect the WakeMed debts. Appellants have not provided any evidence supporting this claim, thus summary judgment was appropriate.

Section 1692f prohibits debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. The section provides a list of acts exemplifying unconscionable debt collection activities. Appellants do not specify which prohibited activities ACS engaged in, but appear to contend that ACS's conduct generally violated the provision. We disagree. Appellants have not presented any evidence that ACS's debt collection methods were illegal, and they do not argue that ACS's collection activities were harassing. While there was an error in attributing the debts to Mrs. Mavilla, this was an error ACS was unaware of, and the methods ACS used to attempt to collect the debt—placing phone calls and mailing letters—are completely legal debt

12

collection practices. The district court properly granted summary judgment to ACS on this claim.

IV.

We next turn to Appellants' claim that the district court erred in granting summary judgment to ACS on the FCRA claim. Count I alleged that ACS either willfully or negligently violated the FCRA[*] when it failed to conduct a reasonable

---

[*] Appellants assert ACS violated 15 U.S.C. § 1681s-2(b) by failing to fulfill the statutorily imposed duties of furnishers of information to consumer reporting agencies. That section provides:

(b) Duties of furnishers of information upon notice of dispute

    (1) In general

    After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—

        (A) conduct an investigation with respect to the disputed information;

        (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

        (C) report the results of the investigation to the consumer reporting agency;

    . . .

    (2) Deadline

    A person shall complete all investigations, reviews, and reports required under paragraph (1) . . . before the expiration of the period under section 1681i(a)(1) of this title [30-day[s] [] beginning on the date on which the

(Continued)

13

investigation of the WakeMed debts after the Mavillas disputed the debts.

The district court provided a thorough and clear overview of the duties imposed on furnishers of information under the FCRA. As the court explained, under the FCRA, when a furnisher of information to consumer reporting agencies is notified of a credit dispute, it must "conduct an investigation with respect to the disputed information," "review all relevant information provided by the consumer reporting agency . . . ," and "report the results of the investigation to the consumer reporting agency" within thirty days of being notified of the dispute. 15 U.S.C. § 1681s-2(b)(1), (2), 15 U.S.C. § 1681i(a). However, a furnisher's duty to investigate is not triggered until it receives notification of a dispute from a consumer reporting agency. See 15 U.S.C. § 1681s-2(b)(1); Stafford v. Cross Country Bank, 262 F. Supp. 2d 776, 784 (W. D. K.Y. 2003) ("This means that a furnisher of credit information, such as the Bank, has no responsibility to investigate a credit dispute until *after* it receives notice from a consumer reporting agency.") (emphasis in original). Once the duty to investigate is triggered, a

_____

> agency receives the notice of the dispute from the consumer or reseller] . . .

15 U.S.C. § 1681s-2(b)(1),(2).

14

furnisher breaches that duty if it fails to comply within thirty days.

Here, the undisputed facts demonstrate that ACS received notification of the disputed debt on September 27, 2010. This was the date that ACS's duties as a furnisher under the FCRA were triggered. As the district court pointed out, "[b]y law, ACS had *thirty (30) days* after receiving notice of the dispute from a CRA within which to investigate and correct any incomplete or inaccurate information ACS had provided to the CRA(s)." Mavilla v. Absolute Collection Serv., Inc., 2013 WL 140046 *8 (E.D.N.C. Jan. 10, 2013)(emphasis in original). It is also uncontested that this action was commenced on October 4, 2010, only five days after ACS's duties arose. Thus, at the time of this suit, ACS had not breached any duty under the FCRA.

Appellants concede that the FCRA "allows 30 days for a furnisher of information to conduct a reasonable investigation," but argue that it "does not establish a safe harbor against suit once a furnisher has done all the investigation it intends to do." Appellants' Br. 16. In sum, Appellants argue that ACS completed all of the investigation that it had intended to undertake at the time this action was commenced and "[g]iving it another 25 days would have been futile and is not what the statute requires." Appellants' Br. 49.

15

Contrary to this assertion, the statute precisely requires that the 30 day period for investigation have expired for ACS to have breached any duty which would give rise to the Mavillas's private right of action under this section of the law. It is inapposite whether ACS would or would not have further investigated because Appellants chose to initiate this lawsuit at a time when ACS by the terms of the law could not have yet breached its duty to investigate. Thus, the district court properly granted summary judgment to ACS on the FCRA claim.

V.

For the reasons set forth, we affirm the judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

AFFIRMED

16