**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

─────────

**No. 17-2241**

─────────

TAMIKA RAY,

           Plaintiff - Appellant,

      v.

INTERNATIONAL PAPER COMPANY,

           Defendant – Appellee.

-------------------------------------------------------

U. S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

           Amicus Supporting Appellant.

─────────

Appeal from the United States District Court for the District of South Carolina, at Spartanburg.  Timothy M. Cain, District Judge.  (7:15-cv-05009-TMC)

─────────

Argued:  September 25, 2018                    Decided:  November 28, 2018

─────────

Before KING and KEENAN, Circuit Judges, and John A. GIBNEY, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.

─────────

Vacated and remanded by published opinion.  Judge Keenan wrote the opinion, in which Judge King and Judge Gibney joined.

─────────

**ARGUED:**  Brian Patrick Murphy, STEPHENSON & MURPHY, LLC, Greenville, South Carolina, for Appellant.  James Walker Coleman, IV, K&L GATES LLP,

Charleston, South Carolina, for Appellee. Paul D. Ramshaw, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Meg E. Sawyer, Karen E. Spain, K&L GATES LLP, Charleston, South Carolina, for Appellee. James L. Lee, Deputy General Counsel, Jennifer S. Goldstein, Associate General Counsel, Elizabeth E. Theran, Acting Assistant General Counsel, Office of General Counsel, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

---

BARBARA MILANO KEENAN, Circuit Judge:

Tamika Ray, an employee of International Paper Company (IPC), appeals from the district court's award of summary judgment to IPC in Ray's action alleging a hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e through 2000e-17. Upon our review, we conclude that there are genuine disputes of material fact with respect to both claims. We therefore vacate the district court's judgment and remand for further proceedings.

I.

We present the facts in the light most favorable to Ray, the nonmoving party, and draw all reasonable inferences in her favor. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 150 (4th Cir. 2012) (citation omitted). IPC, which manufactures and distributes packaging boxes, hired Ray in 2002 to work as a "bundler" in its converting department. In 2007, Ray was promoted to the position of "operator."

Johnnie McDowell was Ray's supervisor in both positions. In 2013, Ray was transferred to the shipping department to work as a "bander operator." In that department, Ray reported to a different supervisor, Benjamin Owens, for the beginning of her shift, and to McDowell when Owens was not present.[1]

---

[1] For purposes of summary judgment, the district court assumed that McDowell was Ray's supervisor at all relevant times. On appeal, neither party challenges this characterization.

Beginning in 2003, one year after Ray began working at IPC, McDowell started acting inappropriately toward Ray, including asking Ray to engage in sexual activity with him and offering to pay her for those acts. McDowell also made several overtly sexual comments to Ray, stating that he wished he could "bend her over [his] desk," that he would father a child with her, and that he would engage in sexual activity with Ray's sister-in-law if Ray did not acquiesce to his demands. McDowell also asked Ray to show him her "cootie," "cha-cha," and "monkey," comments that Ray construed as requests to see her genitals. On one occasion, McDowell grabbed Ray's thigh while the two were alone in his office. McDowell continued this conduct despite Ray's repeatedly refusing his advances and asking him to stop.

In 2013, several years after McDowell's conduct began, Ray reported McDowell's behavior to Owens, and to Derrick Smith, another IPC supervisor. Ray explained that McDowell would not leave her alone and was "ragging her" because she would not "have sex" with him. Although Owens and Smith offered to "say something" about Ray's allegations, she declined out of fear of retaliation. Nevertheless, Ray would "frequently call Owens" requesting to leave work and asking if another employee could cover her shift because of McDowell's continued offensive conduct.

Under IPC's anti-harassment policy, when a supervisor is notified of potential harassment or discrimination, the supervisor is required to report that allegation to his manager, to a human resources representative, or to IPC's legal department. Neither Owens nor Smith formally reported any of Ray's complaints. Although Ray asked

Owens and Smith not to report her first complaint, there is no evidence in the record that she told Owens not to report her later complaints.

In early 2014, McDowell learned that Ray had complained about his conduct. He confronted Ray and asked if she had reported him for sexual harassment. Ray denied making any complaints, and McDowell informed her that such a report could "get him in a lot of trouble."

Around the same time in 2014, McDowell informed Ray that she could no longer perform "voluntary" overtime work before the beginning of her regular work shifts. Before McDowell imposed this restriction, Ray often had arrived four hours before her scheduled shift to perform overtime work.

Because Ray was paid one and one half times her normal rate of pay for overtime work, the voluntary overtime that she performed represented a significant portion of her income. After McDowell suspended Ray from performing voluntary overtime work, other "bander operators" still were allowed to work voluntary overtime hours. Also, IPC employees, including Ray, were required to work additional hours on a mandatory basis at the end of their shift when an employee on the next shift failed to appear for work.

On September 22, 2014, Ray reported McDowell's conduct of sexual harassment to officials in IPC's human resources department. She informed those officials that McDowell repeatedly had propositioned her to have sex, and she provided the names of three other IPC employees to corroborate her allegations. IPC personnel investigated Ray's complaint over the next few days, and conducted interviews of McDowell and other employees.

5

Based on these interviews, the IPC investigators learned that McDowell had told two other employees that he wanted to have sex with Ray, and that McDowell had commented to another employee that Ray was "looking good." One employee also told IPC investigators that McDowell often spent time near Ray's banding machine, and that Ray had complained about McDowell's repeated requests that she engage in sex acts with him.

Although McDowell "den[ied] ever saying anything sexual to or about [Ray,]" the IPC investigators concluded that McDowell was lying. Nevertheless, IPC did not discipline McDowell. The investigators reasoned that Ray's allegations were not corroborated by the statements from other employees, because none of those employees had witnessed McDowell making comments of a sexual nature to Ray. Ultimately, IPC officials instructed McDowell not to communicate directly with Ray in the future.

Ray complained on two other occasions about McDowell to officials in IPC's human resources department, in November 2014 and again in June 2015. Ray claimed that McDowell continually "stared" at her, and that he sabotaged her work on the production line. According to Ray, McDowell's acts of interference prevented her from properly "banding" the units for shipping and caused production delays.

IPC conducted an investigation of Ray's new complaints. One employee confirmed that McDowell had been staring at Ray, and stated that this conduct made that employee feel "uncomfortable." Other employees related that McDowell manually adjusted the production line to make Ray's job more difficult, and that McDowell was

"picking on" Ray. Again, IPC did not discipline McDowell, but instructed him to stop "manually adjust[ing] the line."

In November 2015, Ray filed a complaint in the district court alleging that she was subjected to a hostile work environment based on McDowell's acts of sexual harassment. Ray also asserted a separate claim of retaliation. Upon IPC's motion, a magistrate judge recommended that summary judgment be granted in favor of IPC on both claims. The district court adopted the magistrate judge's recommendation over Ray's objections. With respect to Ray's hostile work environment claim, the district court determined that McDowell's harassing conduct was not imputable to IPC. The district court also concluded that Ray failed to establish a prima facie case of retaliation. Ray now appeals.

## II.

We review the district court's award of summary judgment de novo. *Rosetta Stone Ltd.*, 676 F.3d at 150. Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A.

We begin by addressing Ray's hostile work environment claim, starting with the legal principles relevant to her claim. Title VII states that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] . . . compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). Because an employee's work

environment is a term or condition of employment, harassment based on sex is actionable under Title VII. *See EEOC v. R&R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986)). To succeed on a hostile work environment claim alleging sexual harassment, a plaintiff must show that the offensive conduct (1) was unwelcome, (2) was based on her sex, (3) was "sufficiently severe or pervasive to alter [her] conditions of employment and to create an abusive work environment," and (4) was imputable to her employer. *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 354 (4th Cir. 2013) (citation omitted).

In determining whether the conduct alleged may be imputed to the employer, the employer's liability "may depend on the status of the harasser." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). When a supervisor is the harasser and the "harassment culminates in a tangible employment action, the employer is strictly liable." *Id.* To make such a showing, a plaintiff must demonstrate both that any action taken against her was "tangible," such that the action constituted a "significant change in employment status," and that there was "some nexus" between the harassment and the tangible action taken. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 331-32 (4th Cir. 2012). If the plaintiff fails to carry her burden in this regard, the employer is entitled to assert an affirmative defense commonly

8

known as the *Ellerth/Faragher* defense.[2]  *Ellerth*, 524 U.S. at 765; *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

With regard to her hostile work environment claim, Ray contends that she suffered a tangible employment action as a result of McDowell's acts of sexual harassment. Therefore, Ray argues that the district court erred in failing to hold IPC strictly liable for McDowell's actions and in permitting IPC to assert the *Ellerth/Faragher* defense.  We address Ray's arguments in turn.

i.

Ray asserts that McDowell's decision to deny her voluntary overtime work qualified as a tangible employment action.  IPC, however, argues that Ray did not suffer any pecuniary loss from the denial of voluntary overtime and that, therefore, the elimination of her voluntary overtime hours did not qualify as a tangible employment action.  Relying on Ray's pay records, IPC contends that because Ray earned more money from overtime work in 2015 than in 2014, she cannot show that she lost any income as a result of McDowell's actions.  We disagree with IPC's argument.

A "tangible employment action" is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S.

---

[2] An employer can prevail on this defense by establishing that (1) the employer exercised reasonable care to prevent and correct any harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

9

at 761. In most cases, a tangible employment action "inflicts direct economic harm." *Id.* at 762. This Court has recognized that a decrease in hours, if it reduces an "employee's take-home pay," can constitute a tangible employment action. *See Dulaney*, 673 F.3d at 330 n.7 (quoting *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006)).

We conclude that the record before us could support a jury determination that Ray suffered a tangible employment action when McDowell eliminated her voluntary overtime work. Ray testified that McDowell's decision preventing her from performing this higher-paying work negatively affected her income. Prior to McDowell's action, Ray regularly was permitted to work for four hours before her shift, earning around $24.00 per hour instead of her normal rate of $16.25 per hour. Ray explained that these almost daily voluntary overtime hours were a "significant part of [her] earnings." A reasonable jury could determine that losing this amount of income constituted a "significant change in [Ray's] benefits." *Ellerth*, 524 U.S. at 761.

Our conclusion is not altered by IPC's contention that Ray received a greater amount of overtime hours in 2015 than she received in 2014. Ray did not claim that her ability to earn overtime pay was eliminated completely. Rather, she contended that McDowell and IPC eliminated her opportunity to perform voluntary overtime work, which had been her regular practice. There is no dispute that Ray continued to work overtime hours after her regular shift when needed to "cover" for an absent employee. Thus, Ray's total amount of overtime income in 2015 bears little relevance to her claim that her income was affected negatively, at least for a period, because she was denied the

10

opportunity to do voluntary overtime work. Accordingly, we hold that the record shows disputed issues of material fact regarding the issue whether Ray's loss of voluntary overtime work constituted a tangible employment action.

ii.

We turn to consider whether Ray demonstrated a sufficient nexus between McDowell's offensive conduct toward her and the claimed tangible employment action. IPC argues that there is no evidence that McDowell denied Ray the ability to perform voluntary overtime work because Ray refused to submit to McDowell's sexual demands. We disagree.

Employers are held strictly liable for a supervisor's harassment when the supervisor has been "aided by the agency relationship" in causing the tangible employment action. *Ellerth*, 524 U.S. at 761-62 ("When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation."). Although the harasser's direct involvement is not required to demonstrate that the alleged harassment culminated in a tangible employment action, *see Dulaney*, 673 F.3d at 332-33, when the harasser acts as decisionmaker with respect to the claimed tangible employment action this nexus requirement is easily met. *Ellerth*, 524 U.S. at 762-63 ("Whatever the exact contours of the aided in agency relation standard, its requirement will *always* be met when a supervisor takes a tangible employment action against a subordinate." (emphasis added)); *cf. Brown v. Perry*, 184 F.3d 388, 395 (4th Cir. 1999) (concluding that no tangible employment action was taken when the alleged

11

harasser "took no part in any decision to hire, fire, discharge, transfer, or reassign [the subordinate], or in any way to alter her employment benefits").

Here, the record shows that McDowell was responsible for the decision to eliminate Ray's voluntary overtime work. McDowell's direct involvement in the action obviates any concern about whether his conduct could be imputed to IPC. *See Ellerth*, 524 U.S. at 762 ("[A] tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer."). Additionally, Ray testified that McDowell repeatedly had offered her money in exchange for sex. On one occasion after eliminating her ability to perform voluntary overtime work, McDowell asked Ray whether she wanted to make extra money and told her to meet him after work. Thus, on the present record, it is impossible to separate McDowell's motive for eliminating Ray's voluntary overtime work from McDowell's inappropriate conduct. *See Dulaney*, 673 F.3d at 333 (holding that summary judgment is inappropriate when there is "uncertainty" about whether a nexus exists between harassment and a claimed tangible employment action); *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987) ("[S]ummary judgment is seldom appropriate in [employment discrimination] cases wherein particular states of mind are decisive as elements of [a] claim or defense." (third alteration in original) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979))).

A reasonable jury could determine that McDowell's ongoing harassment of Ray and his direct involvement in the decision to deny her voluntary overtime work were sufficiently linked. Viewing the facts in the light most favorable to Ray, we hold that the

12

district court erred in determining as a matter of law that Ray failed to present sufficient evidence that McDowell's harassment culminated in a tangible employment action.[3]

B.

We next consider Ray's claim of retaliation. Ray contends that a jury reasonably could determine that she was denied voluntary overtime work because she complained about McDowell's harassment. IPC argues in response that the district court correctly held that a denial of overtime work does not constitute an "adverse employment action" for purposes of a Title VII retaliation claim. Alternatively, IPC contends that Ray failed to establish a causal link between her complaints about McDowell's conduct and the elimination of her voluntary overtime hours. We disagree with IPC's arguments.

Under Title VII, it is unlawful for an employer to discriminate against an employee because she has opposed any unlawful employment practice, or has made a charge or has participated in an investigation. 42 U.S.C. § 2000e-3(a). A prima facie case of retaliation requires proof that: (1) the plaintiff engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

Here, there is no dispute that Ray engaged in protected activity under Title VII when she complained to Owens in 2013 about McDowell's acts of harassment.[4] Thus,

---

[3] Because we conclude that there is a genuine question of fact regarding whether Ray suffered a tangible employment action, we do not address further the elements of the *Ellerth/Faragher* defense.

13

we focus on the question whether McDowell's action barring Ray from performing voluntary overtime work was an "adverse employment action" within the meaning of Title VII, and whether there was a causal connection between Ray's protected activity and the adverse employment action.

i.

An adverse employment action is one that "well might have dissuaded a reasonable worker" from engaging in protected conduct. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation and citation omitted). This standard for establishing an adverse employment action under Title VII's antiretaliation provision is more expansive than the standard for demonstrating a tangible employment action under the statute's antidiscrimination provisions. *See id.* at 67. The Supreme Court explained the rationale underlying this broader standard: "Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses. . . . Interpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends." *Id.* Nevertheless, although an adverse action need not "affect the terms and conditions of employment," *id*. at 64, there must be "some direct or

---

[4] Although IPC disputes that Ray made complaints in 2013, Ray stated in her deposition and in her interrogatory responses that she had "frequently" told Owens about McDowell's harassment during this period. For purposes of summary judgment, we view these facts in the light most favorable to Ray.

indirect impact on an individual's employment as opposed to harms immaterially related to it." *Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015).

The district court determined that Ray's loss of voluntary overtime work was not a materially adverse action because there was no evidence that her income decreased as a result. We disagree. As explained above, Ray has adduced sufficient evidence at this stage of the proceedings that she earned substantially less income after complaining about McDowell's conduct. On its face, this decrease in income constituted an adverse employment action. *See Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999) (explaining that an actionable adverse employment action is one in which an employee suffers a "discharge, demotion, *decrease in pay or benefits*, loss of job title or supervisory responsibility, or reduced opportunities for promotion" (emphasis added)).

We need not decide whether every reduction in an employee's overtime hours can qualify as an adverse employment action. It is sufficient in this case that there is evidence that Ray lost a "significant part of [her] earnings." *See Lewis v. City of Chicago*, 496 F.3d 645, 653-54 (7th Cir. 2007) (stating that a loss of overtime can be an adverse employment action for retaliation purposes); *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (same); *see also Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307, 314 (1st Cir. 2016) ("[I]t seems foreseeable that, at least in some contexts, decreased overtime opportunities could cause a 'material' change in the conditions of a plaintiff's employment."). Accordingly, we hold that there remains a dispute of material fact regarding whether Ray's loss of voluntary overtime work was sufficiently severe to constitute an adverse employment action.

15

We turn to consider the "causal nexus" issue in Ray's retaliation claim. We examine whether Ray's retaliation claim is supported by evidence that her complaints about McDowell's conduct resulted in the elimination of her voluntary overtime work. The district court concluded that the time period between Ray's complaints to Owens and McDowell's decision cutting her overtime hours was too great to establish the required causal connection.

Viewing the record in the light most favorable to Ray, we conclude that she has presented sufficient evidence at the summary judgment stage to support her retaliation claim. As noted above, the evidence shows that Ray complained about McDowell to Owens multiple times, and that McDowell learned about these complaints and confronted Ray in "early 2014." Around the same time, McDowell prevented Ray from engaging in her usual practice of performing voluntary overtime work. Although Ray's proffered timeline is not precise, at the summary judgment stage of proceedings we must draw all reasonable inferences in Ray's favor. *Rosetta Stone Ltd.*, 676 F.3d at 150; *see also Foster*, 787 F.3d at 251 ("[T]he burden for establishing causation at the prima facie stage [of a Title VII retaliation claim] is 'less onerous.'" (citation omitted)). Based on the record before us, a jury reasonably could determine that McDowell retaliated against Ray after learning that she had complained about him to other IPC supervisors. Accordingly,

16

we conclude that there are disputed issues of material fact with respect to Ray's retaliation claim against IPC.[5]

### III.

For these reasons, we vacate the district court's award of summary judgment in favor of IPC, and remand the case to the district court for further proceedings.

*VACATED AND REMANDED*

---

[5] Because the district court held that Ray failed to establish a prima facie case of retaliation, the district court did not address whether IPC had a legitimate, nondiscriminatory reason for the adverse action and whether Ray could prove that any reason offered by IPC was merely pretextual. *See Foster*, 787 F.3d at 250. We decline to consider those issues in the first instance.